# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3417

_____

Jodelle L. Kirk

*Plaintiff - Appellee*

v.

Schaeffler Group USA, Inc.; FAG Bearings, LLC

*Defendants - Appellants*

_____

Appeal from United States District Court
for the Western District of Missouri - Joplin

_____

Submitted: September 21, 2017
Filed: April 5, 2018

_____

Before LOKEN, ARNOLD, and SHEPHERD, Circuit Judges.

_____

LOKEN, Circuit Judge.

From 1973 to 1982, FAG Bearings Corporation released thousands of gallons of trichloroethylene (TCE), a volatile organic compound now classified as a hazardous substance, at its manufacturing facility in Joplin, Missouri. In 1991, the Missouri Department of Health and the Environmental Protection Agency (EPA) detected TCE contamination in residential wells in the Villages of Silver Creek and Saginaw, communities south of the FAG Bearings plant. Subsequent litigation established that

FAG Bearings was solely responsible for the TCE contamination in Silver Creek and Saginaw. FAG Bearings began cooperating with EPA and Missouri Department of Health remediation, efforts that continued after Schaeffler Group USA acquired the facility in 2005.

Janice and Stan Kirk moved to Silver Creek in 1987. Their daughter, plaintiff Jodelle Kirk (Kirk), was born the following year and spent her entire childhood in Silver Creek. In 2002, Kirk was diagnosed with autoimmune hepatitis (AIH), a liver disease that occurs when a person's immune system produces antibodies that attack liver proteins, creating inflammation that can lead to fibrosis and cirrhosis. Kirk remains on medication to manage her AIH and faces serious medical issues in the years ahead. In 2013, Kirk brought this diversity action against FAG Bearings, LLC[1] and Schaeffler Group USA (collectively, "Schaeffler"), seeking compensatory and punitive damages. Kirk alleged that Schaeffler's negligent release of TCE and failure to warn the community of TCE contamination caused her to develop AIH.

After discovery, the district court denied Schaeffler's motion for summary judgment. As relevant here, the court concluded that Kirk presented sufficient evidence of causation for a jury to find defendants liable, and that Schaeffler Group USA is judicially estopped to deny it can be held responsible as successor for FAG Bearings' tortious conduct. After a lengthy trial, the district court instructed the jury to return a verdict for Kirk if it found that defendants' negligent "handling, use, or disposal of [TCE] at the Joplin plant, or [failure] to properly warn Plaintiff of the TCE

---

[1]In January 2005, FAG Bearings Corporation converted to FAG Bearings, LLC under Del. Code Ann. tit. 8, § 266; Schaeffler Group USA is the LLC's only member. The district court concluded that FAG Bearings, LLC "constitute[d] a continuation of [FAG Bearings Corporation]" under Delaware law, a ruling not challenged on appeal. Accordingly, we will refer to appellant FAG Bearings, LLC and FAG Bearings Corporation as "FAG Bearings" except where their distinct corporate form aids clarity or is otherwise relevant.

contamination," had directly caused or contributed to Kirk's injury. The jury awarded Kirk $7,600,000 in compensatory damages and, after submission of additional testimony and evidence addressing whether "Defendants' conduct showed complete indifference to or conscious disregard for the safety of others," $13,000,000 in punitive damages. The district court denied Schaeffler's motions for judgment as a matter of law and a new trial. This appeal followed.

On appeal, Schaeffler argues (i) the district court erred in concluding that judicial estoppel bars Schaeffler Group USA from denying that it is liable for FAG Bearings' pre-acquisition torts; (ii) the court abused its discretion by admitting Kirk's experts' opinions regarding whether TCE exposure caused Kirk's AIH, and evidence of regulatory standards governing safe levels of TCE in drinking water; and (iii) the court erred in denying judgment as a matter of law on the causation issue and on Kirk's failure to warn claim. We reverse the district court's judicial estoppel ruling and conclude that (i) Schaeffler Group USA was entitled to summary judgment on the successor liability issue, and therefore (ii) the jury's general verdict requires a new trial on Kirk's punitive damages claim against FAG Bearings, LLC.

## I. The Judicial Estoppel Issue.

**A.** Kirk's complaint alleged that Schaeffler Group USA "owns the brand FAG and . . . took on, purchased or otherwise assumed all assets, properties and liabilities of FAG Bearings LLC, and/or FAG Bearings Corporation." Schaeffler's motion for summary judgment alleged that, after the 2005 conversion, FAG Bearings became Schaeffler Group USA's wholly owned subsidiary; that under Missouri law a parent corporation is not responsible for its subsidiary's actions unless it is the subsidiary's alter ego or plaintiff pierces the corporate veil; that Kirk has the burden to prove Schaeffler Group USA is responsible for FAG Bearings' actions; and that Kirk had no evidence to show that the corporate veil should be pierced or that the Schaeffler parent had any role in FAG Bearings' alleged pre-acquisition tortious acts.

In response, Kirk argued that Schaeffler Group USA should be judicially estopped to deny successor liability because "it has taken the position in other litigation that its . . . purchase of FAG Bearings amounted to a merger of the two companies and that it is responsible for the . . . actions of FAG Bearings." Kirk cited a complaint Schaeffler Group USA filed against the United States before the United States Court of International Trade (CIT) in November 2006, and a February 2008 memorandum it filed in the District of Connecticut in unrelated litigation.

The district court denied Schaeffler Group USA's motion for summary judgment, invoking judicial estoppel based on the allegation in its complaint to the CIT that FAG Bearings Corporation "by change of name and/or merger" was "absorbed into Schaeffler."[2] In applying judicial estoppel, the district court considered the three non-exhaustive factors identified by the U.S. Supreme Court in New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001), and followed by this court in Stallings v. Hussmann Corp., 447 F.3d 1041, 1047 (8th Cir. 2006):

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations . . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party.

The district court ruled that Schaeffler Group USA's position before the CIT was "clearly inconsistent" with its position in this case because "it is black letter law that

---

[2]The court declined to consider whether Schaeffler's memorandum in the District of Connecticut litigation warranted judicial estoppel.

a parent corporation lacks standing to sue for injuries suffered by a subsidiary." The court noted that the CIT stated in an opinion rejecting Schaeffler Group USA's claim on the merits that the court "accepts [Schaeffler Group USA's] undisputed representation that it is the legal successor to . . . FAG Bearings Corp." Schaeffler Grp. USA, Inc. v. United States, 808 F. Supp. 2d 1358, 1360 n.3 (Ct. Int'l Trade 2012). The district court ruled that judicial estoppel is appropriate because "Schaeffler would derive an unfair advantage if not estopped, because it would avoid any liability that it would otherwise have to [Kirk]."

The parties on appeal, like the district court, argue the judicial estoppel issue based on the above-quoted standards from New Hampshire and Stallings, cases that were governed by federal law. However, in this diversity case, we apply the Missouri law of judicial estoppel. See Monterey Dev. Corp. v. Lawyer's Title Ins. Corp., 4 F.3d 605, 608-09 (8th Cir. 1993).[3] This raises the question whether the principles of judicial estoppel differ under Missouri and federal law, in which case the district court should have looked, as we must, to Missouri law. Judge Shepherd in dissent argues that the Supreme Court of Missouri has rejected the New Hampshire factors in favor of a "more general" standard: "[j]udicial estoppel will lie to prevent litigants from taking a position, under oath, in one judicial proceeding, thereby obtaining benefits from that position in that instance and later, in a second proceeding, taking a contrary position in order to obtain benefits . . . at that time." State Bd. of Accountancy v. Integrated Fin. Sols., L.L.C., 256 S.W.3d 48, 54 (Mo. banc 2008).

We conclude the answer under Missouri law is not so simple. One month before the decision in State Board, the Supreme Court of Missouri ruled:

---

[3]By contrast, most circuits apply federal judicial estoppel standards, even in diversity cases. See Frazer, Reassessing the Doctrine of Judicial Estoppel: The Implications of the Judicial Integrity Rationale, 101 Va. L. Rev. 1501, 1516 (2015). However, we are bound to follow Eighth Circuit precedent.

The doctrine of judicial estoppel provides that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." Zedner v. United States, 547 U.S. 489[, 504] (2006), quoting Davis v. Wakelee, 156 U.S. 680, 689 (1895).

Taylor v. State, 254 S.W.3d 856, 858 (Mo. banc 2008). The passage in Zedner quoted in Taylor was itself a quotation from New Hampshire, and after that passage, the U.S. Supreme Court in Zedner quoted the three New Hampshire factors. Though the Supreme Court of Missouri did not cite Taylor in its State Board opinion, it denied rehearing in Taylor *the same day* it issued its opinion in State Board. This is clear indication the Supreme Court of Missouri has *not* rejected consideration of the New Hampshire factors the parties and the district court looked to in deciding the issue in this case. Cf. State v. Honeycutt, 421 S.W.3d 410, 422 (Mo. banc 2013), as modified ("Generally, this Court presumes, absent a contrary showing, that an opinion of this Court has not been overruled *sub silentio*."). Indeed, by our count, since Taylor and State Board were decided, the Missouri Courts of Appeals have considered the New Hampshire factors in a solid majority of the published opinions addressing various judicial estoppel issues.

Both federal and Missouri courts have long considered judicial estoppel an equitable doctrine designed to protect the integrity of the judicial process, preserve the dignity of the courts, and insure order in judicial proceedings. See New Hampshire, 532 U.S. at 750-51; Edwards v. Durham, 346 S.W.2d 90, 101 (Mo. 1961). The doctrine "embodies the notions of common sense and fair play." Egan v. Craig, 967 S.W.2d 120, 126 (Mo. App. 1998). Because the issue is raised in numerous contexts, it is not a doctrine for which "inflexible prerequisites" are appropriate. New Hampshire, 532 U.S. at 751. In Taylor and State Board, very different claims of judicial estoppel were summarily rejected without the need for extensive analysis. We

conclude that the Supreme Court of Missouri would consider the non-exclusive New Hampshire factors in other cases when they are relevant.

When summary judgment is denied based on resolution of a preliminary legal issue such as estoppel, the ruling may be reviewed on appeal from the district court's final order entered after trial. See N.Y. Marine & Gen. Ins. Co. v. Cont'l Cement Co., 761 F.3d 830, 838 (8th Cir. 2014). We review the district court's application of judicial estoppel for abuse of discretion. Stallings, 447 F.3d at 1046.

Under Missouri law, the first New Hampshire factor, whether a party's positions are "clearly inconsistent," is "the threshold essential to a judicial estoppel defense." Imler v. First Bank of Mo., 451 S.W.3d 282, 292 (Mo. App. 2014). If a party's positions can be reconciled, there is no need to protect the integrity of the judicial process from inconsistent positions. Thus, Missouri courts routinely reject invitations to apply judicial estoppel upon determining that two positions are not clearly inconsistent. See, e.g., Parrott v. Severs Trucking, LLC, 422 S.W.3d 478, 486-87 (Mo. App. 2014). Determining whether two positions are "clearly inconsistent" requires interpreting the allegedly contrary representations in context, identifying the underlying legal positions they represent, and analyzing whether those positions can be reconciled. See Berger v. Emerson Climate Techs., 508 S.W.3d 136, 143-45 (Mo. App. 2016). Here, this requires analysis of the context in which Schaeffler Group USA represented to the CIT that FAG Bearings had been "absorbed" into Schaeffler Group USA "by change of name and/or merger."

In its 2006 lawsuit, Schaeffler Group USA alleged that a 1989 Department of Commerce antidumping order declared the domestic ball-bearings industry materially injured by foreign competitors' dumping practices, and the U.S. Bureau of Customs and Border Protection began collecting antidumping duties. The Continued Dumping and Subsidy Offset Act (CDSOA), enacted in 2000, permitted "affected domestic producers" to claim a share of the antidumping duties, but limited this benefit to an

"affected domestic producer" that "was a petitioner or interested party in support of the petition with respect to which an antidumping duty order . . . has been entered, and remains in operation." 19 U.S.C. § 1675c(b)(1)(A)-(B). FAG Bearings, though a member of the injured industry, had not supported the petition that led to the 1989 order. Schaeffler Group USA alleged that the CDSOA's petition-support requirement was unconstitutional and therefore it was entitled to FAG Bearings' "share of CDSOA disbursements for fiscal years 2004 and 2005." The CIT denied relief but accepted Schaeffler Group USA's representation that it would have been entitled to FAG Bearings' share had the claim prevailed.

The district court concluded that Schaeffler Group USA's claim to recover antidumping duties to which FAG Bearings was entitled was necessarily a representation that Schaeffler Group USA is a legal successor to FAG Bearings, a representation "clearly inconsistent" with its position denying successor liability for Kirk's tort claims based on FAG Bearings' pre-acquisition conduct. As a general matter of corporate law, we find no clear inconsistency inherent in an acquiring corporation claiming that it has succeeded to the acquired company's claim to a government benefit and also claiming that it did not assume the acquired company's liabilities. Under Missouri law, even if all or substantially all of FAG Bearings' assets were acquired, this fact alone would not constitute a merger nor transfer FAG Bearings' liabilities to Schaeffler Group USA. See, e.g., Edwards v. Black Twig Mktg. & Commc'ns LLC, 418 S.W.3d 512, 520 (Mo. App. 2013); ARE Sikeston Ltd. P'ship v. Weslock Nat'l, Inc., 120 F.3d 820, 828 (8th Cir. 1997).

In this case, the lack of a clear inconsistency becomes clear upon analysis of the CIT judicial proceeding. Customs regulations implementing the CDSOA provide:

> In the case of a company that has succeeded to the *operations* of a predecessor company that appeared on the USITC list, the successor company may file a certification to claim an offset as an affected domestic producer on behalf of the predecessor company. In its certification, the company must name the predecessor company to which

it has succeeded and it must describe in detail the duly authorized succession by which it is entitled to file the certification.

19 C.F.R. § 159.61(b)(1)(i) (emphasis added). The regulations do not further define "successor company" or what constitutes "authorized succession." The reference to "operations" suggests, consistent with the purpose of antidumping duties, that the successorship issue was focused more on domestic ball-bearing production assets than on the way those assets were acquired and owned. Consistent with that interpretation, in another case challenging the constitutionality of the petition-support requirement, the court described as "successor" an entity that, by acquisition, "became an affected domestic producer eligible to receive [CDSOA] distributions." SKF USA, Inc. v. U.S. Customs & Border Prot., 556 F.3d 1337, 1346 & n.11 (Fed. Cir. 2009), cert. denied, 560 U.S. 903 (2010). And in a case involving a different antidumping order, Customs denied a CDSOA claim, concluding claimant was not a successor because it could not identify what percentage of the production assets it had acquired, and failed to show it was legally entitled to claim its predecessor's CDSOA distributions. U.S. Customs & Border Prot., Re: Affected Domestic Parties, Continued Dumping and Subsidy Offset Act of 2000, HQ H121457, 2011 WL 7445504 at *3-*5 (Oct. 31, 2011).

Schaeffler Group USA's unopposed representation "accepted" by the CIT in 2012 was not clearly inconsistent with the parent-subsidiary relationship claimed in this case. In substance, Schaeffler Group USA pleaded that it was entitled to assert FAG Bearings' claim because it acquired at least a substantial portion of the aggrieved domestic ball-bearing production assets, and FAG Bearings transferred or assigned its right to seek CDSOA distributions that FAG Bearings had been unlawfully denied. Cf. Vt. Agency of Nat. Res. v. United States ex rel. Stevens, 529 U.S. 765, 773 (2000) ("the assignee of a claim has standing to assert the injury in fact suffered by the assignor"). Schaeffler Group USA did not explain what it meant by the ambiguous words "merger" and "absorbed." Given the focus of antidumping duties on domestic producing assets, that was doubtless of little importance to the CIT, particularly in an order denying relief on the merits. Had the issue been fully litigated under the

Customs regulation, Schaeffler Group USA would have had to "describe in detail [its] duly authorized succession," and the CIT would have determined whether Schaeffler Group USA was a "successor" to FAG Bearings' claim for CDSOA distributions, applying an antidumping law standard that would not necessarily make Schaeffler Group USA a successor to FAG Bearings' liability for pre-acquisition torts under Missouri law.

The district court erred in applying judicial estoppel based on Schaeffler Group USA's pleading before the CIT. The court stated it is "black letter law" that a parent corporation has no standing to assert a subsidiary's claims. That is doubtless true in many contexts, but it is not "clearly" applicable to the unique regulatory claim at issue before the CIT. When a party's position is not clearly inconsistent with the position taken in another proceeding, "there is no reason to estop it from asserting that position." Hossaini v. W. Mo. Med. Ctr., 140 F.3d 1140, 1143 (8th Cir. 1998).

Kirk also argued to the district court that judicial estoppel was warranted because Schaeffler Group USA represented to the U.S. District Court for the District of Connecticut that "FAG Bearings Corp., does not exist as a separate legal entity apart from Schaeffler." The district court did not rely on this alleged inconsistency, and Kirk notes but does not argue the issue on appeal. But Judge Shepherd in dissent concludes that judicial estoppel is properly invoked because Schaeffler asserted that FAG Bearings "has no distinct corporate existence," contrary to its position in this case that Schaeffler Group USA is not liable for the torts of its subsidiary, FAG Bearings, LLC. We disagree for numerous reasons. First, the Connecticut litigation context. Schaeffler Group USA and FAG Bearings Corporation were brought into a jet engine malfunction damage action as additional defendants when discovery revealed that engine bearings may have been manufactured by "FAG Germany." Their motion for summary judgment was based on the fact that neither "had any relationship to the bearings" in question -- the separate German corporation was not a subsidiary of Schaeffler Group USA, and FAG Bearings Corporation was not a

"distinct legal entity . . . subject to suit." Second, after the 2005 conversion, it was FAG Bearings, LLC that survived as Schaeffler Group USA's wholly-owned subsidiary, not FAG Bearings Corporation, so the representation that "FAG Bearings Corp., does not exist as a separate legal entity" was accurate. Third, the memorandum did not assert that FAG Bearings, LLC was an "unincorporated division." It simply cited that aspect of Connecticut law to illustrate that a non-entity lacks the capacity to be sued. Fourth, and most important, Schaeffler Group USA and FAG Bearings were voluntarily dismissed from the action before the Connecticut court ruled on their motion, so Schaeffler Group USA did not "obtain[] benefits from that position in that [proceeding]," State Board, 256 S.W.3d at 54.

Schaeffler Group USA did not take "clearly inconsistent" positions in the CIT litigation considered by the district court, or in the Connecticut litigation on which Judge Shepherd bases his dissent. Nor do the other New Hampshire factors warrant invoking the equitable doctrine of judicial estoppel. Schaeffler Group USA's unopposed position that was accepted by the CIT did not mislead that court nor result in a benefit to Schaeffler Group USA other than "standing" to assert FAG Bearings' unsuccessful claim. Nor did Schaeffler's attempt to clarify the legal status of FAG Bearings Corporation in 2008 mislead the district court in Connecticut or benefit Schaeffler Group USA. Any disadvantage to Kirk from allowing Schaeffler Group USA to assert its position in this case will result from Missouri law limiting a parent corporation's liability for the torts of its subsidiary, not from Schaeffler Group USA playing "fast and loose" with the courts. For these reasons, we conclude the district court abused its discretion in ruling that Schaeffler Group USA is judicially estopped to deny successor liability.

**B.** The remaining question is the relief to which Schaeffler Group USA is entitled on appeal. Schaeffler argues the district court should have dismissed this defendant because Kirk failed to meet her burden of proving successor liability. The district court simply noted that Kirk's "failure to plead piercing the corporate veil or

-11-

[her] inability to show alter ego liability is irrelevant if judicial estoppel applies." Kirk's appeal brief did not address this issue. We conclude it is proper to direct Schaeffler Group USA's dismissal because the summary judgment record warranted that relief as a matter of law. See Nat'l Farmers Union Std. Ins. Co. v. Morgan, 966 F.2d 1250, 1254 (8th Cir. 1992); Bernitsky v. United States, 620 F.2d 948, 956 (3d Cir.), cert. denied, 449 U.S. 870 (1980); Stein v. Oshinsky, 348 F.2d 999, 1002 (2d Cir.), cert. denied, 382 U.S. 957 (1965); 28 U.S.C. § 2106.

Schaeffler's summary judgment motion asserted that Schaeffler Group USA and FAG Bearings, LLC have a parent-subsidiary corporate relationship. Schaeffler submitted an affidavit by Schaeffler Group USA's corporate Treasurer declaring he had personal knowledge of the transaction and stating that FAG Bearings, LLC was formed on January 6, 2005, and "[s]ince the date of its formation . . . has been wholly owned by Schaeffler Group USA, Inc.," and that "[p]rior to 2005, Schaeffler Group USA, Inc., had no ownership interest in either FAG Bearings Corporation or FAG Bearings, LLC." Kirk submitted no evidence showing that Schaeffler Group USA is liable for FAG Bearings' pre-acquisition torts.

The general rule that a parent corporation is not liable for torts committed by its subsidiary is well established:

> As a general rule, two separate corporations are to be regarded as distinct legal entities, even if the stock of one is owned partly or wholly by the other. Ordinarily, a parent corporation is not liable for the acts of its subsidiary corporation. An exception to the rule occurs in the situation where the plaintiff pierces the corporate veil.

Mitchell v. K.C. Stadium Concessions, Inc., 865 S.W.2d 779, 784 (Mo. App. 1993) (citations omitted). Likewise, what a plaintiff must show to pierce this corporate veil is well established:

-12-

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and
(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and
(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Collet v. Am. Nat'l Stores, Inc., 708 S.W.2d 273, 284 (Mo. App. 1986) (citation omitted); see Radaszewski v. Telecom Corp., 981 F.2d 305, 306 (8th Cir. 1992) (applying Missouri law), cert. denied, 508 U.S. 908 (1993); see generally United States v. Bestfoods, 524 U.S. 51, 61-63 (1998). This is obviously a fact-intensive inquiry.

In opposing summary judgment, Kirk submitted no evidence showing she may pierce the corporate veil of Schaeffler Group USA's wholly-owned subsidiary, FAG Bearings, LLC. Rather, Kirk urged the district court to apply judicial estoppel because "a legal successor through merger or change of name" is responsible for the actions of the acquired company. This assertion was based on another well-established principle of Missouri corporate law:

[W]here one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former . . . [except]: (1) when the purchaser expressly or impliedly agrees to assume the debts and liabilities; (2) *when the transaction amounts to a consolidation or merger*; (3) when the purchaser is merely a continuation of the seller; and (4) when the transaction is entered into fraudulently to escape liability for the debts and liabilities.

-13-

Edwards, 418 S.W.3d at 520 (emphasis added) (quotation and citations omitted); see Sherlock v. Quality Control Equip. Co., 79 F.3d 731, 733-34 (8th Cir. 1996) (applying Missouri law). In a true merger or consolidation, the acquired company ceases to exist. See Dodier Realty & Inv. Co. v. St. Louis Nat'l Baseball Club, 238 S.W.2d 321, 324-25 (Mo. banc 1951). Here, it is undisputed that both parent Schaeffler Group USA and subsidiary FAG Bearings, LLC continued to exist after the transaction. Missouri courts have also applied the merger exception to a transaction referred to as a "de facto merger." However, determination that a de facto merger occurred is again a fact-intensive inquiry based on factors such as continuity of management and business operations, continuity of shareholders, whether the acquiring corporation assumed obligations necessary to continue business operations, and whether the seller corporation "dissolv[ed] as soon as possible." Harashe v. Flintkote Co., 848 S.W.2d 506, 509 (Mo. App. 1993); see ARE Sikeston, 120 F.3d at 829; E. Prairie R-2 Sch. Dist. v. U.S. Gypsum Co., 813 F. Supp. 1396, 1400 (E.D. Mo. 1993) ("a de facto merger may not occur if the predecessor corporation continues to exist."). Thus, even if Schaeffler Group USA acquired all or substantially all the assets of FAG Bearings Corporation by "converting" it to the FAG Bearings, LLC subsidiary, this does not establish, without more evidence, that a "de facto merger" warranting successor liability occurred.

Kirk, at the close of extensive discovery, opposed Schaeffler's motion for summary judgment on the successor liability issue solely on the basis of a judicial estoppel defense we have rejected. As Kirk otherwise failed to prove successor liability, the district court erred in denying summary judgment dismissing Schaeffler Group USA as a separate defendant. This disposition obviously does not moot Schaeffler's appeal from the final judgment against FAG Bearings, LLC.

-14-

## II. FAG Bearings' Appeal.

Post-trial dismissal of Schaeffler Group USA because Kirk failed to prove successor liability does not affect the jury's finding that FAG Bearings, LLC is liable for negligently causing Kirk's AIH injury, so we must turn to FAG Bearings' appeal from the final judgment awarding Kirk compensatory and punitive damages.

**A. Punitive Damages.** The jury awarded Kirk $13,000,000 in punitive damages against both Schaeffler Group USA and FAG Bearings, LLC. The jury returned a general verdict, which failed to distinguish how much Schaeffler Group USA owes from how much FAG Bearings, LLC owes. Since Kirk invited the jury to base the award in part on Schaeffler Group USA's conduct (*e.g.*, that Schaeffler Group USA's 2010 environmental statement "misleading[ly]" told the public that FAG Bearings' release of TCE was "accidental"), the general award cannot be upheld against FAG Bearings only. See State ex rel. Hall v. Cook, 400 S.W.2d 39, 41-42 (Mo. banc 1966); Saunders v. Flippo, 639 S.W.2d 411, 412 (Mo. App. 1982). In addition, because Kirk's counsel in closing argument emphasized defendants' *joint* ability to pay an adequate punitive damages award and referred the jury to testimony that Schaeffler Group USA "ha[s] enough resources to handle this," granting FAG Bearings, LLC a new trial on the issue of punitive damages is consistent with the Supreme Court's decision in Washington Gas-Light Co. v. Lansden, 172 U.S. 534, 556 (1899):

> Where the judgment is based upon a cause of action of such a nature that it might work injustice to one party defendant, if it were to remain intact as against him, while reversed for error as to the other defendants, then we think the power exists in the court, founded upon such fact of possible injustice, to reverse the judgment in toto and grant a new trial in regard to [the remaining] defendants.

A partial new trial on damages is permitted by Rule 59(a)(1). Although this procedure should not be used when damages and liability are "so interwoven . . . that

-15-

the former cannot be submitted to the jury independently of the latter without confusion and uncertainty," Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931), we have often remanded for retrial of punitive damages only. See Robertson Oil Co. v. Phillips Petrol. Co., 871 F.2d 1368, 1376 (8th Cir. 1989). Punitive damages may vary based on which negligence theory the jury adopted. See Smith v. Brown & Williamson Tobacco Corp., 275 S.W.3d 748, 812-22 (Mo. App. 2008). Here, the jury's general verdict did not identify the theory of liability Kirk proved, negligent handling of TCE, negligent failure to warn, or both. However, the separate evidence submitted on punitive damages took only two of the sixteen trial days and focused on FAG Bearings' lack of cooperation with the government from 1991 to 1998, including its failure to warn. That evidence was relevant to both theories of liability, and since Kirk presented a submissible case as to both, the question of punitive damages may be submitted anew to a jury without retrying the issues of liability and compensatory damages as well. Likewise, Kirk's compensatory damages case was based entirely on FAG Bearings' conduct, so dismissal of Schaeffler Group USA does not affect that award. In these circumstances, we conclude that remand for a partial new trial limited to the issue of FAG Bearings, LLC's punitive damages liability is appropriate.

**B. Causation.** An essential element of a negligence claim is proof of "causation in fact," a reasonable connection between the defendant's tortious conduct and the plaintiff's injury. Elam v. Alcolac, Inc., 765 S.W.2d 42, 173 (Mo. App. 1988), cert. denied, 493 U.S. 817 (1989). In a toxic tort case, the plaintiff's burden includes proof of "an exposure to an identified harmful substance significant enough to activate disease[,] . . . expert opinion that the disease found in plaintiff is consistent with exposure to the harmful substance[, and proof that] defendant was responsible for the etiologic agent of the disease diagnosed in plaintiff." Id. at 178 (citations omitted). At trial, Kirk presented extensive expert testimony and reports addressing these issues. Based on their research, Dr. Kathleen Gilbert and Dr. Thomas Zizic opined that exposure to TCE causes AIH. Hydrologist Lorne G. Everett, a TCE

-16-

contamination expert, testified that he had never seen higher levels of TCE contamination than at the Newton County Wells Site (the contamination zone at issue), and that Kirk was exposed to significant levels of TCE throughout her early childhood. Based on this exposure, Dr. Gilbert and Dr. Zizic specifically opined that TCE caused Kirk's AIH.

1. On appeal, Schaeffler first argues that Kirk failed to prove causation in fact because Dr. Gilbert and Dr. Zizic failed to establish she was exposed to a level or quantity of TCE significant enough to cause her AIH, as in Wright v. Willamette Industries, Inc., 91 F.3d 1105, 1107-08 (8th Cir. 1996). The issue is difficult because AIH is a rare disease and what causes it has not been clearly established. While it is a known carcinogen that can cause many health issues, TCE has never been definitively identified as the cause of AIH in human beings. But Dr. Gilbert and Dr. Zizic presented substantial scientific evidence tending to establish that exposure to TCE can cause AIH, and Dr. Everett testified to extensive TCE contamination in the Silver Creek community and the many ways Kirk was exposed to that contamination for many years. We do not require "a mathematically precise table equating levels of exposure with levels of harm." Id. at 1107, quoted in Bednar v. Bassett Furniture Mfg. Co., 147 F.3d 737, 740 (8th Cir. 1998). Like the district court, we conclude Kirk submitted sufficient evidence of general causation to submit her claim to the jury.

2. Schaeffler further argues the district court abused its discretion by admitting speculative opinions by Dr. Gilbert and Dr. Zizic that TCE exposure specifically caused Kirk to develop AIH. An expert's testimony to be admissible "must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." Johnson v. Mead Johnson & Co., 754 F.3d 557, 561 (8th Cir.) (quotation omitted), cert. denied, 135 S. Ct. 489 (2014); see Fed. R. Evid. 702. In Daubert v. Merrell Dow Pharmaceuticals, Inc., the Supreme Court set forth four factors to guide district courts in resolving admissibility questions: whether the expert's methodology has been tested, has been subjected to

peer review, has a known or knowable error rate, and is generally accepted in the scientific community. 509 U.S. 579, 593-94 (1993); see Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1207-08 (8th Cir. 2000). "As long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." Johnson, 754 F.3d at 562, quoting Daubert, 509 U.S. at 590.

Prior to trial, the district court denied Schaeffler's motion to exclude opinions by these experts that it is more likely than not that TCE caused Kirk's AIH (specific causation). As to Dr. Gilbert, the court explained:

> Dr. Gilbert's opinion is not connected to the existing data merely by her own empty assertion. It relies on a significant amount of admissible evidence to posit that [Kirk] was exposed to a significant level of TCE both in utero and while growing up in Silver Creek, by ingesting, inhaling, and absorbing TCE through her skin. While Dr. Gilbert's report does not estimate an exact level of exposure, it explains why such an estimate is not possible. It also provides a reliable basis for her opinion that [Kirk's] exposure to TCE was such that, over time, acting on a genetic predisposition, it caused [Kirk] to develop AIH, and it was not idiopathic [i.e., of unknown cause].

On appeal, Schaeffler argues, as it argued to the district court, that these specific causation opinions were inadmissible because Dr. Gilbert and Dr. Zizic (i) could not systematically rule out alternative causes of Kirk's AIH; (ii) did not establish that Kirk was exposed to an amount of TCE that can cause AIH in humans; and (iii) did not adequately explain why Kirk's AIH was more likely caused by TCE exposure rather than some unknown cause. The argument is not focused on the experts' specific trial testimony, except Dr. Gilbert's testimony that:

where a young woman in a very small community is living over a Superfund Site that is contaminated with TCE, and the chances of anybody in that small group getting [AIH], which is a rare disease, is very small.

So, to me, that seemed pretty much like a no-brainer.

A differential etiology rules in plausible causes and then systematically rules out less plausible causes until a most plausible cause emerges. A medical causation opinion based upon proper differential etiology "is acceptable causation testimony under Daubert." Johnson, 754 F.3d at 560 n.2. When an expert's differential analysis fails to rule in exposure to the alleged cause at issue (general causation) *and* fails to rule out other possible causes, the specific causation opinion is not sufficiently reliable and should be excluded. See Bland v. Verizon Wireless, L.L.C., 538 F.3d 893, 897-98 (8th Cir. 2008). But "we have consistently ruled that experts are not required to rule out all possible causes when performing the differential etiology analysis." Johnson, 754 F.3d at 563; see Lauzon v. Senco Prods., Inc., 270 F.3d 681, 693 (8th Cir. 2001) (the requirement to rule out other possible causes "cannot be carried to a quixotic extreme"). "Instead, such considerations go to the weight to be given the testimony by the factfinder, not its admissibility." Johnson, 754 F.3d at 564; accord Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265-66 (4th Cir. 1999) (not ruling out other causes affects weight, not admissibility). On this record, we conclude the district court did not abuse its discretion in admitting the experts' specific causation opinions.

3. Prior to trial, the district court denied Schaeffler's motion to exclude eight government reports, explaining they were "generally admissible" under the public records exception to the hearsay rule. See Fed. R. Evid. 803(8). On appeal, Schaeffler argues the district court abused its discretion by admitting the portions of EPA and Minnesota Department of Health reports stating the public health regulatory standards for TCE, and instructing the jury that "exceeding these numbers does not

in and of itself establish causation in this case, though it may be considered by you in determining causation."  The standards at issue are EPA's "maximum contaminant level" under the Safe Drinking Water Act of five parts per billion, and a Minnesota Health Department "Guidance for Drinking Water" of 0.4 parts per billion TCE.

We have little doubt the regulatory standards were probative evidence, to be compared to the concentrations of TCE found in Silver Creek wells in addressing the levels of TCE contamination to which residents were exposed.  But whether exceeding the concentrations set forth in those regulatory standards was direct evidence of general and specific causation is a different question, as the district court initially recognized.  Regulatory standards express risk assessments that are designed to protect public health.  "[A] regulatory standard, rather than being a measure of causation, is a public-health exposure level that an agency determines pursuant to statutory standards."  Sutera v. Perrier Grp. of Am. Inc., 986 F. Supp. 655, 664 (D. Mass. 1997) (citation omitted).  Thus, a legislature or regulatory agency may set standards -- permissible or mandatory -- "without having precise data on the question of how much harm, or what kind of harm, some specific amount of that substance might reasonably be expected to cause to . . . an ordinary person."  Wright, 91 F.3d at 1107.  In the TCE regulatory environment, the district court properly instructed that "exceeding these numbers does not in and of itself establish causation."  There was no abuse of the court's discretion in fashioning appropriate instructions.

**C. Failure to Warn.**  To recover for negligent failure to warn, Kirk must prove cause in fact -- that the FAG Bearings hazard caused her injury -- and proximate cause -- that an adequate warning from the defendant "would have altered the behavior of the individuals involved in the accident."  Moore v. Ford Motor Co., 332 S.W.3d 749, 761-62 (Mo. banc 2011) (quotation omitted).  Schaeffler argues that, even if Kirk established causation in fact, she did not establish that an adequate warning from FAG Bearings would have altered her or her family's behavior.

Under Missouri law, there is a rebuttable presumption that a plaintiff with no prior knowledge of the hazard would have heeded an adequate warning of the specific danger that caused her injury. Arnold v. Ingersoll-Rand Co., 834 S.W.2d 192, 194 (Mo. banc 1992). A defendant may rebut the presumption with evidence that the plaintiff either knew of the danger or did not heed warnings from other sources. See Bachtel v. TASER Int'l, Inc., 747 F.3d 965, 971-72 (8th Cir. 2014) (applying Missouri law); Johnson v. Medtronic, Inc., 365 S.W.3d 226, 232 (Mo. App. 2012).

At trial, Kirk's mother testified that, if adequately warned, the family would not have moved to Silver Creek in 1987, years before the discovery that FAG Bearings' releases of TCE at its facility had caused significant off-site contamination. See Lewis v. FAG Bearings Corp., 5 S.W.3d 579, 583 (Mo. App. 1999). After that discovery in 1991, EPA and the Missouri Department of Health warned the community including Kirk's parents about the health risks of TCE in drinking water. Schaeffler presented evidence that government agencies sent "at least eight warnings to the Kirk residence explaining the potential effects of TCE exposure," and documents showing that Kirk's father invested in a new city water system despite government testing tending to show that the family's well was not contaminated with TCE. But that evidence did not address Kirk's claim that an adequate warning in 1987 would have prevented her injury. Though FAG Bearings argued that it had no knowledge of off-site contamination prior to 1991, there was evidence that FAG Bearings knew of on-site TCE contamination before the government agencies did, and failed to warn the surrounding communities of potential risk. Though Kirk's trial evidence was not carefully focused on "the effect of giving a warning on the actual circumstances surrounding the accident," Arnold, 834 S.W.2d at 193, like the district court we conclude it was sufficient to submit this claim to the jury.

### III. Conclusion.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded with directions to dismiss the claims against Schaeffler Group USA with prejudice, and for further proceedings not inconsistent with this opinion regarding the punitive damage claim against FAG Bearings, LLC.

SHEPHERD, Circuit Judge, dissenting.

Vacating a jury's decision is not to be done lightly on appellate review. Because the majority dismisses a defendant and vacates the jury's punitive damages verdict on procedurally and substantively suspect grounds, I respectfully dissent from Sections I, II.A, and III of the majority opinion.

The punitive damages verdict is only vacated because the majority disagrees with the application of judicial estoppel. Schaeffler Group USA ("Schaeffler") remained in this action because the district court estopped it from arguing that it was a separate entity from FAG Bearings, LLC ("FAG Bearings"). The majority disagrees and so, effectively, dismisses Schaeffler. From there, the majority goes on to hold that Schaeffler's presence at trial tainted the punitive damages verdict and thus overturns it.

I first part ways with the majority on how it handles the judicial estoppel ruling. I concede that there was an abuse of discretion in how the district court applied judicial estoppel here. See Stallings v. Hussmann Corp., 447 F.3d 1041, 1046 (8th Cir. 2006) (application of judicial estoppel is reviewed for abuse of discretion). State law, not federal law—which the district court applied—controls application of judicial estoppel in diversity cases. Spencer v. Annett Holdings, Inc., 757 F.3d 790, 797 (8th Cir. 2014) ("Our precedent calls for the application of state law elements of judicial estoppel in diversity cases.").

Normally when this occurs, we "remand[] for application of the correct legal standard." Rille v. PricewaterhouseCoopers LLP, 803 F.3d 368, 374 (8th Cir. 2015) (en banc). This would be the prudent course here because judicial estoppel is a "somewhat malleable doctrine using equitable principles," Dunellen, LLC v. Getty Prop. Corp., 567 F.3d 35, 38 (1st Cir. 2009), and the parties have not briefed how the issue would be resolved under Missouri law. See Pariser v. Christian Health Care Sys., Inc., 816 F.2d 1248, 1253 (8th Cir. 1987) (holding that "question of relief should be decided under Illinois law. . . . It has not been briefed in this Court, and we leave it to the District Court to decide on remand.").

Yet the majority forgoes our normal route. I respectfully disagree with the result reached. Because this Court can affirm "on any ground supported by the record," Chavez-Lavagnino v. Motivation Educ. Training, Inc., 767 F.3d 744, 751 (8th Cir. 2014)—and because of the "extreme deference" jury verdicts are entitled to, Craig Outdoor Advert., Inc. v. Viacom Outdoor, Inc., 528 F.3d 1001, 1009 (8th Cir. 2008)—I would affirm the application of judicial estoppel under Missouri law given that there is evidence in the record to do so.

First, the legal backdrop. The majority concedes that the Supreme Court of Missouri has never adopted three-factor federal judicial estoppel framework articulated in New Hampshire v. Maine, 532 U.S. 742 (2001). And it points out that the Supreme Court of Missouri has not once, but twice, had the opportunity to adopt those factors but declined to do so.[4] Nevertheless it "conclude[s] that the Supreme

_____

[4]The majority deems it significant that the Supreme Court of Missouri once cited the U.S. Supreme Court for a general formulation of judicial estoppel. See Taylor v. State, 254 S.W.3d 856, 858 (Mo. 2008). There is a distinction, however, between citing general language—thereby maintaining flexibility in the analysis—and a three-factor framework, which the Taylor court could have cited. Significantly, the Missouri Court of Appeals started using the New Hampshire framework prior to Taylor. See, e.g., Vinson v. Vinson, 243 S.W.3d 418, 422 (Mo. Ct. App. 2007). And perhaps most importantly, the last articulation of judicial estoppel by the Supreme

-23-

Court of Missouri would consider the non-exclusive New Hampshire factors in other cases when they are relevant" because the Missouri Court of Appeals has applied the factors in some cases.

This starting point is problematic because "only decisions of a state's highest court can bind us on state law," and while "decisions of state intermediate courts can be persuasive, they are not controlling." Boswell v. Panera Bread Co., 879 F.3d 296, 302 (8th Cir. 2018) (Arnold, J.); see also Garner et al., The Law of Judicial Precedent 656 (West 2016) ("A state high court's interpretations of state law are authoritative in all other jurisdictions."). In Boswell, the "Missouri Court of Appeals . . . repeated [a] locution" that had never been adopted by the Supreme Court of Missouri, and we declined to apply it. 879 F.3d at 303. Boswell's logic is all the more relevant here because the Missouri Court of Appeals has not always applied the framework that the majority presents as Missouri law. See, e.g., Nooter Corp. v. Allianz Underwriters Ins. Co., No. ED 103835, 2017 WL 4365168, at *28 (Mo. Ct. App. Oct. 3, 2017), reh'g denied (Jan. 23, 2018).

In contrast with the majority, I begin with the Supreme Court of Missouri's formulation of judicial estoppel. Cf. Mo. Const. art. V, § 2 ("The supreme court shall be the highest court in the state . . . [i]ts decisions shall be controlling in all other courts."). In its last opinion articulating a standard for judicial estoppel, the Supreme Court of Missouri opted for a general formulation: "[j]udicial estoppel will lie to prevent litigants from taking a position, under oath, in one judicial proceeding, thereby obtaining benefits from that position in that instance and later, in a second

_____

Court of Missouri in State Board of Accountancy v. Integrated Financial Solutions, L.L.C., 256 S.W.3d 48, 54 (Mo. 2008) ("State Board"), was also general in nature. Contrary to the majority's assertion, I am not arguing that there was a "*sub silentio*" overruling of Taylor in State Board. What I am saying, though, is that there was never an explicit, or even "*sub silentio*," adoption of the New Hampshire factors by the Supreme Court of Missouri.

proceeding, taking a contrary position in order to obtain benefits . . . at that time." State Board, 256 S.W.3d at 54 (second alteration in original) (internal quotation marks omitted).

Just as instructive as the State Board formulation is the State Board analysis. There, it was alleged that a "representation" made in a prior brief estopped a party from making an argument. The State Board court was not concerned with factors other courts have held to be decisive, including (1) whether the opposing party relied on the statement, cf. 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4477 (2d ed. 1981 & Supp. 2017) ("Federal Practice and Procedure § 4477") (describing reliance requirement adopted by some courts)[5]; and (2) whether the prior representation was accepted by a court, cf. Maharaj v. Bankamerica Corp., 128 F.3d 94, 98 (2d Cir. 1997) (judicial estoppel applicable *only* where "inconsistent position was adopted by the court in some manner"). Instead, its analysis was straightforward: it simply looked at whether the "representation" in the prior proceeding foreclosed the party's position in the suit before it. State Board, 256 S.W.3d at 55 (finding that prior representation was general in nature and did not "purport to draw a legal conclusion," meaning it did not foreclose the party's argument in the current proceeding).

All this is to say that the Supreme Court of Missouri has adopted an analytic framework, binding on us, of judicial estoppel that is less focused on rigid requirements and more on "preserv[ing] the dignity of the courts." Edwards v. Durham, 346 S.W.2d 90, 101 (Mo. 1961). This approach is not unique. Wright & Miller has termed it the "fast-and-loose theory," which is focused on preventing the "deliberate toying with the courts." Federal Practice and Procedure § 4477; see also

---

[5]In Taylor, the Supreme Court of Missouri counseled that judicial estoppel should apply "especially if"—not only if—"it be to the prejudice of the party who has acquiesced in the position formerly taken by him." 254 S.W.3d at 858 (internal quotation marks omitted).

In re Contest of Primary Election Candidacy of Fletcher, 337 S.W.3d 137, 144 (Mo. Ct. App. 2011) ("Were parties allowed to take inconsistent positions at their whim, it would allow chaotic and unpredictable results in our court system, which of course would be problematic for a host of reasons."). And thus our inquiry, as mandated by the Supreme Court of Missouri, should be exactly that: has Schaeffler "tak[en] a contrary position [to one it has taken previously] in order to obtain benefits" in this case? State Board, 256 S.W.3d at 54.

I believe we can answer that question in the affirmative, which brings me to the prior representations made by Schaeffler. There are two representations in the record, one made before the Court of International Trade, and one made in the District of Connecticut.[6] The majority makes a plausible case that the former is not a "contrary position." The majority attempts to say the same with regards to the latter. By contrast, I find the latter representation to be decisive evidence of Schaeffler "toying with the courts."

As a threshold matter, the majority suggests that, under State Board, Schaeffler did not "obtain[] benefits" from the position it took before the district court in Connecticut because it was voluntarily dismissed. This is a mischaracterization of State Board. The pertinent portion of the State Board formulation, again, is "[j]udicial estoppel will lie to prevent litigants from taking a position, under oath, in one judicial proceeding, *thereby* obtaining benefits." 256 S.W.3d at 54 (emphasis added). The "benefit[]," as defined by State Board, is being able to take a litigating position under oath in court as Schaeffler did in the district court in Connecticut. See *Thereby*, Black's Law Dictionary (10th ed. 2014) (defining "thereby" as "[b]y that means" or "in that way").

---

[6]The District of Connecticut representation was made in a motion for summary judgment. See RAPP 634-36. It is referred to throughout as the "D. Conn. Motion."

-26-

On the substance, the majority argues that Schaeffler represented to the district court in Connecticut that "FAG Bearings Corporation" lacked the capacity to be sued. So, because "FAG Bearings, LLC"—not "FAG Bearings Corporation"—"survived as Schaeffler's wholly-owned subsidiary," the majority finds no inconsistency with the representation made here by Schaeffler: FAG Bearings, LLC is a distinct corporate entity.

The majority does not grapple, however, with the core of Schaeffler's position in the Connecticut proceeding. After Schaeffler acknowledged FAG Bearings converted from a corporation to an LLC, it gave its bottom line: "'FAG Bearings' is an assumed name or a 'd/b/a' under which Schaeffler sometimes conducts business . . . [i]t has no distinct corporate existence." D. Conn. Motion at 2.[7]

It is true that before asserting that FAG Bearings had "no distinct corporate existence," Schaeffler referred to it as a "wholly-owned subsidiary of Schaeffler." D. Conn. Motion at 2. As the majority correctly notes, even if "Schaeffler acquired all or substantially all of FAG Bearings' assets, this fact alone would not . . . transfer FAG Bearings' liabilities to Schaeffler." There are, however, broad-based exceptions to this, including "when the purchaser is merely a continuation of the seller." Edwards v. Black Twig Mktg. & Commc'ns LLC, 418 S.W.3d 512, 520 (Mo. Ct. App. 2013). Thus, where "the business operations are identical" and the "transferee uses . . . [the] name of the transferor," continuation will typically be found. See State ex rel. Family Support Div. v. Steak'm Take'm LLC, 524 S.W.3d 584, 591 (Mo. Ct. App. 2017) (continued running of a restaurant with same name despite change in ownership enough for continuation).

---

[7]Schaeffler's General Counsel at that time, Steven L. Crow, Esq., swore to these facts in an affidavit underlying the D. Conn. Motion. No party entered the underlying affidavit in the record here.

By all measures, Schaeffler argued it was a continuation of FAG Bearings before the district court in Connecticut. It argued that FAG Bearings "sold all of its assets except for some land and buildings" to Schaeffler. D. Conn. Motion at 2. And, critically, it argued that "'FAG Bearings' is an assumed name or a 'd/b/a.'" D. Conn. Motion at 2. Add that to Schaeffler's unqualified assertion that FAG Bearings "has no distinct corporate existence," D. Conn. Motion at 2, it becomes clear that Schaeffler argued that "[Schaeffler] is merely a continuation of [FAG Bearings]." Edwards, 418 S.W.3d at 520.

In sum: Schaeffler's General Counsel swore in another proceeding before an Article III court that FAG Bearings lacks a "distinct corporate existence" from Schaeffler in order to avoid liability and, in these proceedings, Schaeffler argues that "[it] is separate from FAG Bearings," Appellant Br. 11, to, again, avoid liability. Cf. New Hampshire, 532 U.S. at 749-50 (noting it is "uniformly recognized" that judicial estoppel is meant to "prohibit[] parties from deliberately changing positions according to the exigencies of the moment" (internal quotation marks omitted)).

The disagreement over how Missouri law applies to the facts here reinforces that remand—and a decision after briefing and argument—is the correct course of action. But given that we have decided not to remand, I believe that the majority errs in reversing the district court's judicial estoppel determination. Because this is the only reason the majority dismisses Schaeffler and reverses the punitive damages verdict, I do not believe those actions are warranted. Instead, I would uphold both the compensatory and punitive damages verdicts in full against both Schaeffler and FAG Bearings. Thus, I join in Sections II.B and II.C of the majority opinion, which upholds the compensatory damages verdict against FAG Bearings, but respectfully dissent from the rest of the opinion.

_____