

# In the Missouri Court of Appeals
# Eastern District
### DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED106637 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| vs. | ) | |
| | ) | Honorable Christopher E. McGraugh |
| ELIZABETH SUTTLES, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 28, 2019 |

## Introduction

Elizabeth Suttles ("Suttles") appeals from the judgment of the trial court, entered after a jury convicted her of furnishing pornographic materials to a minor and first-degree statutory sodomy. On appeal, Suttles challenges the testimony of two witnesses regarding delayed disclosures of sexual-abuse incidents (Points One and Two) and the trial court's exclusion of certain testimony of the victim's hallucinations (Point Three). Because both witnesses were qualified and their testimony concerning delayed disclosures was generalized, relevant, and reliable, the trial court did not err in allowing their testimony. Because the evidence of the victim's hallucinations proffered by Suttles during her offer of proof was cumulative and unfairly prejudicial, we find no error in the trial court's exclusion of such evidence. Accordingly, we affirm the trial court's judgment.

Factual and Procedural History

We view the facts of this case in the light most favorable to the verdict. State v. Forrest, 183 S.W.3d 218, 223 (Mo. banc 2006) (internal citation omitted). We address only the facts relevant to Suttles's points on appeal.

J.J. knew Suttles as the daughter-in-law of his grandmother's friend. J.J. spent time with Suttles and her husband when J.J. was young. Specifically, J.J. occasionally spent the night at Suttles's home when J.J.'s mother worked. Suttles lived with her husband and her in-laws. J.J.'s grandmother was often present when J.J. was at the Suttleses' home.

When J.J. was approximately six-years old, he was alone in the Suttleses' family basement with Suttles and her husband. After J.J. had already been in the basement for a time, Suttles and her husband began having sex while J.J. watched. While having sex with her husband, Suttles forced J.J. to "play with her breasts and suck on her breasts." Suttles then told J.J. to remove his pants and placed J.J.'s penis in her mouth. J.J. did not speak of this incident until he was ten years old, at which time he told his mother that he was sexually assaulted without providing any detail.

Six years later, in 2017, J.J. attempted suicide. During this time and since he was twelve-years old, J.J. had experienced suicidal thoughts and hallucinations. On the way home from the hospital, J.J. told his mother about the incident with Suttles and her husband. J.J. subsequently reported the incident to the police.

The State then charged Suttles with one count of furnishing pornographic materials to a minor and one count of statutory sodomy in the first degree. The case proceeded to a jury trial.

## I.      Anthony Harper's Testimony

During pre-trial proceedings, Suttles sought to exclude the testimony of Anthony Harper ("Harper"), a forensic-interviewer for the Children's Advocacy Center. Suttles maintained that

Harper's testimony was particularized and failed to meet the Daubert[1] test for admissibility of evidence. The trial court labeled Harper's anticipated testimony as generalized, but deferred any admissibility determination until hearing the testimony at trial.

Following voir dire, the State conducted an offer of proof regarding Harper's testimony. Harper testified that during his work as a forensic interviewer, he conducted 863 child interviews. Further, Harper spoke at length about his experiences with children disclosing incidents of abuse:

> I've interviewed kids who have provided what I would refer to as a tentative disclosure where they provided some information. I've experienced children who have provided some accounts of what happened, and the person who was alleged to have committed those acts has admitted to more than what the child told me.
> I've had kids that provided a complete account of what's happening to them as best as their abilities afforded them, and there's been some rare instances where a child has taken back what they've said during an interview.

The trial court ruled that Harper's testimony was admissible before the jury. The trial court determined that Harper was a qualified expert and that his proffered testimony met the Daubert standard for admissibility.

At trial, Harper testified regarding his work as a forensic interviewer and his expertise and skills regarding child interviews. Harper interviewed J.J. when J.J. was approximately fifteen years old. Harper discussed generally his interview style with children and his ability to filter out suggestibility among children and look past inconsistencies in children's narratives. The State asked Harper about the different types of disclosures by children who have been abused. Suttles objected, arguing that Harper lacked the level of expertise necessary to permit him to testify about different types of disclosures. The trial court overruled Suttles's objection. Harper testified that delayed disclosures of child-abuse victims are not uncommon or unusual.

---

[1] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593–94 (1993).

3

Harper discussed, in detail, the various types of disclosures made by child-victims in cases of sexual abuse, including delayed disclosures.

During cross-examination by Suttles, Harper testified that he did not know the exact number of interviews he had conducted on children of various age groups. Harper emphasized that every situation is different regarding both the child's disclosure and the interviewer's ability to assess the veracity of the child's statements.

## II.     Det. Kelli Swinton's Testimony

At trial, the State called Kelli Swinton ("Det. Swinton"), a St. Louis City police detective, to testify regarding her investigation of J.J.'s case. While working in the child-abuse unit, Det. Swinton received several trainings, including ChildFirst—which teaches general techniques for investigating crimes involving children and the process of child disclosures—a week-long training regarding victims of child abuse, and child-family training. Det. Swinton was assigned to J.J.'s case after the incident was reported through the police department hotline. Although Det. Swinton investigated Suttles and acted as the arresting officer, she did not interview J.J. personally.

The State questioned Det. Swinton regarding the occurrence of delayed disclosures in child-abuse cases, given her four years of experience in the child-abuse unit and her work on approximately one hundred cases per year—the majority of which involved sexual abuse. Suttles objected to this line of questioning, arguing that any testimony from Det. Swinton about delayed disclosures was irrelevant, speculative, and invaded the province of the jury. After a discussion and the State laying further foundation for Det. Swinton's delayed-disclosures testimony, the trial court overruled Suttles's objection. Det. Swinton then testified that she typically handled more sexual-abuse cases than other child-victim cases. Det. Swinton further testified that, based upon her experience, it is very common for child-victims of sexual abuse to

4

delay disclosing the abuse. Det. Swinton testified that over ninety percent of disclosures by child-victims of sexual abuse were delayed disclosures.

Suttles cross-examined Det. Swinton regarding her experience with delayed disclosures. In response to Suttles's questions, Det. Swinton could not provide specific statistics regarding the number of her child-abuse cases that involved a delayed disclosure after the sexual assault.

### III. Hallucination Evidence

During pre-trial proceedings, the State moved to limit evidence relating to J.J.'s adjudication proceeding in juvenile court. Specifically, the State sought to exclude specific evidence of J.J.'s adjudication, including the charges, class of the offense, sentence, and punishment. Suttles, however, sought leave of the trial court to allow questioning concerning J.J.'s juvenile history and the connection of that juvenile history to J.J.'s hallucinations. The trial court prohibited the introduction of evidence relating to J.J.'s adjudication unless Suttles could show a connection of such evidence to a motive or bias at trial. Additionally, the State sought to exclude evidence of J.J.'s mental-health medical diagnosis. The trial court permitted Suttles to ask J.J. whether he was experiencing auditory and visual hallucinations. Because Suttles did not intend to go into the specific medical diagnosis, the trial court did not rule on the admissibility of J.J.'s medical history.

At trial, the trial court permitted both the State and Suttles to question J.J. about his hallucinations and the events leading to his 2017 hospitalization following his suicide attempt. J.J. testified that he experienced hallucinations before and while he was in the hospital. J.J. related one hallucination where he saw a little boy standing face first in a dark corner of the room. J.J. also noted that he experienced multiple auditory hallucinations where male and female voices would tell him to hurt himself. However, J.J. was firm in his testimony that he did not hallucinate the sexual abuse incident involving Suttles:

5

[b]ecause I know whenever I'm seeing something that's not there and I know when something actually happened because I feel it and I remember everything. I remember where it all took place. I remember their names. I remember what the rooms looked like. I remember how it sounded; what it smelled like; what it looked like. I remember everything.

In response to Suttles's questions about J.J.'s hospitalization following his 2017 suicide attempt, J.J. testified that he attempted suicide after an argument with his father. The State objected to Suttles questioning J.J. about whether his father was around when J.J. was growing up and whether J.J.'s father was in jail. Suttles explained to the court that she wished to provide evidence that J.J.'s father was in jail during the attempted suicide incident and that J.J. had hallucinated the argument that he says led him to attempt suicide. The trial court allowed Suttles's line of questioning. Suttles then asked J.J. whether he had a conversation with his father on January 17, 2017 at a restaurant with his mother and sister. J.J. admitted that he had spoken in person with his father.

Suttles sought to question J.J. about other incidents of hallucinations; in particular, whether J.J. had hallucinations telling him to break into people's garages and houses. The trial court sustained the State's objection to the introduction of evidence mentioning J.J.'s prior juvenile criminal history. The trial court found the evidence bordered on character evidence, and that Suttles was unable to show the relevance of such evidence on the issue of J.J.'s truthfulness.

Outside the hearing of the jury, Suttles made an offer of proof regarding J.J.'s hallucinations telling him to break into people's garages and houses:

SUTTLES: [J.J.], you had auditory hallucinations that told you to break into people's garages. Is that right?
J.J.: Yes, ma'am.
SUTTLES: You had auditory hallucinations that told you to enter into people's houses. Is that right?
J.J.: Yes, ma'am.
SUTTLES: You had auditory hallucinations that told you on occasion to hurt other people beside yourself. Is that right?
J.J.: Yes, ma'am.

6

```
SUTTLES:  You also suffered from paranoia.  Is that right?
J.J.:     Yes, ma'am.
SUTTLES:  And the paranoia would be that you would think that random people
          were talking about you all the time.  Is that right?
J.J.:     It was a little bit more to that, but yes.
SUTTLES:  What else was it?
J.J.:     I would have—like I couldn't be alone.  Like in the house, I would—
          if I was home alone, I would stand in one room with the lights all the
          way on because I couldn't go anywhere else because I felt like
          somebody would be in the house or stuff like that.
```

At the close of the State's case and at the close of all evidence, Suttles moved for judgment of acquittal, which the trial court denied.  The trial court submitted the case to the jury for deliberations.  The jury returned a verdict, finding Suttles guilty of furnishing pornographic materials to a minor and guilty of first-degree statutory sodomy.  The trial court denied Suttles's motion for a new trial and sentenced Suttles to six months in a medium-security institution for the furnishing-pornographic-materials-to-minors charge, to be served consecutive with twelve years in prison for the first-degree statutory sodomy charge.  Suttles now appeals.

<u>Points on Appeal</u>

Suttles raises three points on appeal.  In Points One and Two, Suttles argues the trial court abused its discretion in permitting Harper (Point One) and Det. Swinton (Point Two) to testify as to the process of disclosure by child-victims of sexual abuse when speaking to forensic interviewers and to the frequency of delayed disclosures by such children.  Suttles challenges the testimony of both witnesses as irrelevant, unreliable, invading the province of the jury, being more prejudicial than probative, and improperly bolstering J.J.'s credibility.  In Point Three, Suttles contends that the trial court abused its discretion in excluding evidence of the circumstances surrounding J.J.'s hallucinations and in precluding Suttles from presenting evidence that J.J. fabricated or hallucinated the allegations made against her.

7

The trial court "has broad discretion to admit or exclude evidence at trial." State v. Zink, 181 S.W.3d 66, 72 (Mo. banc 2005) (internal quotations omitted). We review the trial court's ruling on the admission of evidence for an abuse of that discretion. Id. at 72–73; see also State v. Johnson, 207 S.W.3d 24, 42 (Mo. banc 2006). "That discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." Zink, 181 S.W.3d at 73 (internal quotations omitted). Further, we review the trial court's decisions for prejudice, not mere error. Id. "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." State v. McWilliams, 564 S.W.3d 618, 629–30 (Mo. App. W.D. 2018).

## Discussion

**I.        Points One and Two—Delayed-Disclosures Testimony**

In her first two points on appeal, Suttles focuses on the admissibility of evidence regarding the process of disclosures by children of alleged sexual abuse when speaking to forensic interviewers, and the frequency of delayed disclosures by such children. Specifically, Suttles contends that Harper's and Det. Swinton's testimonies were unreliable, speculative, improperly invaded the province of the jury, improperly particularized, and were developed expressly for the purpose of testifying at trial.

The commonality of both points is whether the witnesses' testimony passes the expert-testimony admission test set forth in Section 490.065.2. If so, the trial court is permitted discretion to allow such evidence as "expert testimony" offered to assist the jury in its deliberations. See Jones v. City of Kansas City, 569 S.W.3d 42, 53 (Mo. App. W.D. 2019). If

8

not, then such opinion testimony is deemed inadmissible because it invades the province of the jury to reach its conclusions based upon the evidence before it. State v. Pickens, 332 S.W.3d 303, 321–22 (Mo. App. E.D. 2011). Because Points One and Two are interrelated, we discuss them together.

### A.     Point One—Harper's Testimony

Suttles attacks Harper's testimony regarding delayed disclosures of child-victims as "junk science" created solely for use as evidence at trial, and posits that the testimony is irrelevant, unreliable, and prejudicial to Suttles.

We allow expert testimony generally "to assist the jury in areas that are outside of everyday experience or lay experience." State v. Rogers, 529 S.W.3d 906, 911 (Mo. App. E.D. 2017) (citing Pickens, 332 S.W.3d at 321). Importantly, Missouri limits the admissibility and use of expert witness testimony during a criminal proceeding. See Jones, 569 S.W.3d at 53.

### 1.     The Appropriate Standard for Expert-Testimony Admissibility

Before assessing Suttles's argument that Harper's expert testimony failed to meet the Daubert standard, we deem it pertinent to address the amendment to Section 490.065.2[2] and its effect on our analysis of expert-testimony admissibility.

Prior to 2017, Section 490.065 applied a standard for the admissibility of expert testimony similar to that found in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). See State Bd. of Registration for the Healing Arts v. McDonagh, 123 S.W.3d 146, 153 (Mo. banc 2003) (citing to Section 490.065 RSMo (2000)); see also State ex rel. Gardner v. Wright, 562 S.W.3d 311, 316 (Mo. App. E.D. 2018). Missouri treated the federal standards as persuasive but not mandatory authority. McDonagh, 123 S.W.3d at 153, 155 (citing generally Daubert, 509

---

[2] All Section references are to RSMo (Cum. Supp. 2018), unless otherwise noted.

U.S. 579; Frye, 293 F. 1013).  In McDonagh, the Supreme Court of Missouri noted the

differences between Section 490.065 RSMo (2000) and the Federal Rules of Evidence ("FRE").

Id. at 155.  In so holding, the Court noted that:

> To the extent that [S]ection 490.065 [RSMo (2000)] mirrors FRE 702 and FRE 703, as interpreted and applied in Daubert and its progeny, the cases interpreting those federal rules provide relevant and useful guidance in interpreting and applying [S]ection 490.065 [RSMo (2000)].  To the extent that the two approaches differ, however, the standard set out in [S]ection 490.065 [RSMo (2000)] must govern.

Id.; see also Giddens v. Kansas City S. Ry. Co., 29 S.W.3d 813, 820 (Mo. banc 2000) ("The

construction given by the federal courts to their rules does not control the interpretation of our

state rules, even if the rules themselves are nearly identical.  However, the experiences of those

courts in applying rules similar to our own are illustrative.").  In rejecting Daubert as the

threshold for admitting expert testimony, our Supreme Court held that Section 490.065 RSMo

(2000) only "require[d] a showing that the facts and data are of a type reasonably relied on by

experts in the field in forming opinions or inferences upon the subject of the expert's testimony."

McDonagh, 123 S.W.3d at 156.

Years after McDonagh, the Missouri Legislature amended Section 490.065, which

became effective on August 28, 2017.  Section 490.065.  The language of Sections 490.065.2(1)–

(2) are now identical in their language to FRE 702–703 and state:

> (1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>     (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>     (b) The testimony is based on sufficient facts or data;
>     (c) The testimony is the product of reliable principles and methods; and
>     (d) The expert has reliably applied the principles and methods to the facts of the case;
> (2) An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion

10

> may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

This Court since has held that because the language of Section 490.065 now mirrors FRE 702 and 703, and because FRE 702 and 703 are interpreted under Daubert and its progeny, the cases interpreting those federal rules remain relevant and useful in guiding our interpretation of Section 490.065. See Jones, 569 S.W.3d at 54. Importantly, however, while these cases provide relevant and useful guidance, the Daubert factors themselves are not controlling:

> [FRE 702] does not codify the Daubert factors, but is broad enough to require consideration of any or all of the specific Daubert factors where appropriate. Other factors may also be relevant, but no single factor is necessarily dispositive of the reliability of a particular expert's testimony. Thus, while the rule enumerates some considerations, the inquiry about admissibility is still intended to be flexible.

Wright, 562 S.W.3d at 318–19 (internal quotations omitted).

Since the amendment of Section 490.065, Missouri courts have used the condensed three-part standard examined in Johnson and discussed in Wright to determine the admissibility of expert opinion testimony. See Jones, 569 S.W.3d at 54 (citing Wright, 562 S.W.3d at 318–19; Johnson v. Mead Johnson & Co., 754 F.3d 557, 561 (8th Cir. 2014)). Specifically, we evaluate: "(1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable." Id. (citing Wright, 562 S.W.3d at 319).

### 2. Harper was a Qualified Expert

The trial court determined that Harper was a qualified expert. Under Section 490.065.2, an expert is qualified by "knowledge, skill, experience, training, or education." Section 490.065.2(1). Harper is a forensic interviewer who previously worked approximately twenty years for the Missouri Children's Division, primarily in the child-abuse unit. Harper had "hundreds of hours of training from child sexual abuse to other types of maltreatment," among other training. While at the Missouri Children's Division, Harper conducted more than 1900

interviews and assisted or supervised additional interviews. As a forensic interviewer, Harper has conducted 863 forensic interviews.

The record shows that Harper aptly demonstrated his experience and training with child-abuse cases at trial. We are persuaded that the trial court appropriately exercised its discretion in qualifying Harper as an expert based on his knowledge, experience, and training with child-abuse interviews. See Section 490.065.2(1); Zink, 181 S.W.3d at 72–73. Next, we evaluate whether the testimony at issue—Harper's testimony regarding delayed disclosures—was relevant.

### 3. The Delayed-Disclosures Testimony was Relevant

Suttles disputes the relevance of evidence of delayed disclosures, arguing that this concept has become common knowledge in today's society given the notoriety of the "me too" movement.[3] Accordingly, Suttles reasons that any testimony at trial regarding delayed disclosures of abuse or any other type of disclosure falls within the everyday experience of a juror, and is not permissible expert testimony.

We analyze relevance under Section 490.065.2 using "substantively the same relevance analysis our courts have been employing, particularly in child[-]sex cases: whether 'the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence.'" Wright, 562 S.W.3d at 319 (quoting State v. Baker, 422 S.W.3d 508, 513 (Mo. App. E.D. 2014)); see also State v. Williams, 858 S.W.2d 796, 798 (Mo. App. E.D. 1993). Under this standard, Missouri courts long have recognized "that generalized testimony about the behaviors of children alleging sexual abuse is specialized knowledge and that it is helpful to juries." Id.

---

[3] The recent "me too" movement involves "adult women disclosing sexual assaults from years earlier." Wright, 562 S.W.3d at 314.

12

"In cases where the sexual abuse of a child is at issue, there are two types of testimony that are typically at the forefront of a challenge against an expert witness—generalized and particular." McWilliams, 564 S.W.3d at 626.

> General testimony describes behaviors and characteristics commonly found in victims. Particularized testimony concerns a specific victim's credibility as to the abuse. The trial court has broad discretion in admitting general testimony, but particularized testimony must be rejected because it usurps the fact-finding role of the jury and thus is inadmissible.

Rogers, 529 S.W.3d at 911; see also State v. Churchill, 98 S.W.3d 536, 539 (Mo. banc 2003). Expert witnesses may not testify regarding their opinions of a witness's credibility. McWilliams, 564 S.W.3d at 626. The jury is the "sole arbiter of witness credibility"; thus, "[w]hen the trier of fact is as capable as the witness to draw conclusions from the facts provided, opinion testimony is usually inadmissible." State v. Ferguson, 568 S.W.3d 533, 540, 543 (Mo. App. E.D. 2019) (internal quotations omitted).

The facts here are similar to, but also different from, those in Rogers. Rogers, 529 S.W.3d at 908–09. In Rogers, the same witness, Harper, testified in a case involving a child-victim of sexual abuse. Id. at 909. During his testimony, Harper described types of disclosures commonly observed in child-victims of sexual abuse. Id. However, in Rogers, Harper further testified "how [the c]hild's specific actions and statements in the video aligned with the aforementioned interview themes and were therefore reliable and consistent with sexual abuse." Id. We held this portion of Harper's testimony was particularized and improper, because the State used Harper's testimony to bolster the child's credibility. In doing so, the more particularized testimony prejudiced the defendant. Id. at 916. We reversed the trial court's judgment in Rogers, noting that "[t]he jury's verdict hinged on its impression of [the c]hild's credibility, and Harper's particularized testimony provided a 'stamp of truthfulness' that invaded the province of the jury." Id.

13

Critical here, the record shows that Harper neither opined on whether J.J.'s allegations and statements were credible, nor specifically commented on whether he believed J.J.'s allegations. See id.; see also Ferguson, 568 S.W.3d at 541 (finding that the trial court abused its discretion in permitting the witness to provide her lay opinion as to the believability of the victim's allegations). To the contrary, Harper merely offered general testimony regarding any child's likelihood to disclose sexual-abuse incidents years after the incident occurred. See Ferguson, 568 S.W.3d at 543 (discussing the distinction between general and particularized expert testimony).

Harper's testimony regarding delayed disclosures was limited to explaining the process of disclosures generally and the common experiences of children in sexual-abuse cases to withhold allegations after an incident of abuse. See id. at 544 (holding that the expert witness's testimony regarding the victim's individual performance during the interview was inadmissible particularized testimony). Although Harper acknowledged in his testimony that he interviewed J.J., Harper never spoke to J.J.'s credibility or expressed an opinion with respect to the truthfulness of J.J.'s statements during the interview. See Rogers, 529 S.W.3d at 911. Thus, Harper's testimony was generalized testimony. Id.; see also Wright, 562 S.W.3d at 319; Baker, 422 S.W.3d at 513; Zink, 181 S.W.3d at 72.

When evaluating expert testimony regarding delayed disclosures of children who have experienced sexual abuse, admissibility requires more than a generalized versus particular analysis; the evidence must also be relevant.

> The general rule in Missouri is that relevance is two-tier: logical and legal. Evidence is logically relevant if it tends to make the existence of a material fact more or less probable. Logically relevant evidence is admissible only if legally relevant. Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay,

14

> waste of time, or cumulativeness. Thus, logically relevant evidence is excluded if its costs outweigh the benefits.

State v. Anderson, 76 S.W.3d 275, 276 (Mo. banc 2002) (internal citations omitted). When analyzing the relevance of opinion testimony, it would be an abuse of the trial court's discretion to admit the opinion of an expert witness if the jurors themselves are capable of drawing correct conclusions from the facts proved. Pickens, 332 S.W.3d at 321.

Here, expert testimony discussing general behaviors commonly found in child-victims of sexual abuse and the process investigators use to uncover allegations of abuse was relevant and admissible. Such testimony "is generally accepted . . . [as] admissible because it assists the jury in understanding the behavior of sexually abused children, a subject beyond the range of knowledge of the ordinary juror." Baker, 422 S.W.3d at 514 (internal quotations omitted); see also Wright, 562 S.W.3d at 319; Pickens, 332 S.W.3d at 321. We understand that Harper did not provide specific and precise statistics showing a comparison of his past cases involving substantially similar facts to the case before us. Harper merely testified that delayed disclosures in child-abuse cases were more common than not. Suttles's argument that the lack of a more precise statistical analysis precluded admissibility is unavailing. We have repeatedly held that delayed-disclosures evidence is relevant in cases involving child-victims of sexual abuse. Wright, 562 S.W.3d at 320. Suttles's argument goes to the weight of Harper's testimony, not its admissibility. See Pickens, 332 S.W.3d at 321 (noting that "[t]he jury must still resolve what weight it will accord" the testimony). The trial court did not abuse its discretion in determining that Harper's delayed-disclosures testimony was relevant to the issues of the case. See Zink, 181 S.W.3d at 72–73. Consequently, we next consider whether Harper's delayed-disclosures testimony was reliable under the Section 490.065 admissibility requirements.

15

### 1.     The Delayed-Disclosures Testimony was Reliable

The trial court determined that Harper's delayed-disclosures testimony satisfied the Daubert and Kumho Tire Co. admission standards for expert testimony. Suttles argues that Harper's testimony regarding delayed-disclosures by child-victims of sexual abuse is not reliable and does not meet the standard for expert testimony. Suttles asks us to evaluate the science behind delayed disclosures and its reliability for use generally by experts in sexual-abuse cases with child victims, as well as Harper's specific testimony at trial. Specifically, Suttles contends that: (1) the science behind delayed disclosures was developed expressly for the purpose of litigation; and (2) Harper's inability to provide specific percentages or numbers regarding his observations and experiences with delayed disclosures rendered his testimony nothing more than subjective belief or unsupported speculation.

Testimony is reliable under Section 490.065.2 if it is "based on sufficient facts or data, reliable principles and methods and reliable application thereof." Wright, 562 S.W.3d at 319; see also Jones, 569 S.W.3d at 54. "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." Wright, 562 S.W.3d at 321 (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 156 (1999) (expanding the Daubert reasoning to all expert testimony, not simply that which was considered "scientific")). "As long as an expert's testimony 'rests upon "good grounds, based on what is known" it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset.'" Jones, 569 S.W.3d at 56 (quoting Johnson, 754 F.3d at 562). "The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Wright, 562 S.W.3d at 317–18 (quoting Daubert, 509 U.S. at 596).

16

Further, the factors enumerated in Daubert[4] "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his [or her] testimony." Kumho Tire Co., 526 U.S. at 150.

The term "delayed disclosures" originates in an article published in 1983 by Dr. Roland Summit, M.D., ("Dr. Summit") a clinical psychiatrist. See State v. J.L.G., 190 A.3d 442, 445–46 (N.J. 2018). Drawing upon various sources, including his own clinical practice, Dr. Summit identified five categories of behavior commonly reported in child-victims of sexual abuse—known more generally as child sexual abuse accommodation syndrome ("CSAAS"). Id. at 446. In an extremely thorough analysis of the admissibility of expert testimony relating to the various categories of behavior identified by Dr. Summit, the New Jersey Supreme Court commented that of the various behaviors associated with CSAAS, only delayed disclosures by child–victims of sexual abuse had long-standing support in scientific literature and among experts. Id. at 464.[5] Although the delayed-disclosures theory is not easily subject to peer review and/or publication under the Daubert factors, scientists generally accept the theory to explain a common behavior seen in child-victims of sexual abuse. See id. at 446. While finding only limited scientific

---

[4] The four Daubert factors are: (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the known rate of error for the technique or theory and the applicable standards for operation; and (4) whether the technique is generally accepted. See Daubert, 509 U.S. at 593–94.

[5] The J.L.G. opinion noted the existence of consistent and long-standing support in the scientific literature that most child-victims of sexual abuse delay disclosures, citing a 1994 study finding that that "74.9% of victims did not disclose abuse 'within the year that it first occurred, and 17.8% . . . waited more than [five] years.'" J.L.G., 190 A.3d at 459 (quoting Diana M. Elliott & John Briere, *Forensic Sexual Abuse Evaluations of Older Children: Disclosures and Symptomatology*, 12 BEHAV. SCI. & L. 261, 268 (1994)). The court further noted that while a 2005 study criticized certain aspects of CSAAS, the report "nonetheless found empirical support for the principle that delayed disclosure 'is very common.'" Id. (quoting Kamala London, Maggie Bruck, Stephen J. Ceci & Daniel W. Shuman, *Disclosure of Child Sexual Abuse: What Does the Research Tell Us About the Ways that Children Tell?*, 11 PSYCHOL. PUB. POL'Y & L. 194, 220 (2005)). The opinion references additional studies supporting a conclusion that delayed disclosures among victims of child abuse are a recognized behavior. J.L.G., 190 A.3d at 459–60.

support for the overall five-part syndrome known as CSAAS, expert evidence relating to delayed disclosures among child-victims of sexual abuse was allowed. Id. at 464–65.

Suttles cites no authority—and we find no precedent—supporting Suttles's charge that delayed-disclosures evidence, and in particular Harper's testimony, was developed solely for courtroom testimony. As noted above, the theory of delayed disclosures, first described by a clinical psychiatrist in 1983, has long been accepted by well-recognized experts as a behavior in victims of child abuse. Accordingly, we reject Suttles's attempt to discredit the theory of delayed disclosures as a device created solely for use in the courtroom. As a theory, delayed disclosure testimony rests upon "good grounds, based on what is known." See Jones, 569 S.W.3d at 56.

Moving away from her general criticism of delayed-disclosures evidence, Suttles next attacks Harper's testimony as unreliable because the testimony was not sufficiently specific, and was merely speculative. Missouri courts have long recognized that testimony explaining delayed disclosures, even if not given that precise phrase, "assists the jury in understanding the behavior of sexually abused children[.]" Wright, 562 S.W.3d at 320. We note that in Wright, this Court focused primarily on the relevance of delayed-disclosures testimony under the newly amended Section 490.065. Id. We limited our holding in Wright to the issue of relevance because the trial court excluded the delayed-disclosures evidence as such evidence was deemed "not specialized knowledge that would assist the jury." Wright, 562 S.W. 3d at 320. Because relevance and not reliability was the "lynchpin of the [trial court's] ruling," our holding in Wright did not analyze the reliability prong of the expert-testimony-admission analysis under the facts presented in that case. Id. at 322. However, as we noted in Wright "[t]here is nothing per se unreliable about testimony based on personal observations made in the course of an expert's professional

18

experiences." Id. at 321. Similar to the expert testimony analyzed in Wright, Harper testified about the process of child-victim disclosures using his personal observations based on his professional experiences and trainings. See id. at 314–15, 320.

Harper relied on his training as a forensic interviewer when speaking with J.J. Harper's training involved, among other trainings, information regarding interviews of a child-victim of sexual abuse and the behaviors of children during interviews. Harper's own experience interviewing children was consistent with the scientifically reported behavior of delayed disclosures. See J.L.G., 190 A.3d at 464–65. During the course of his many interviews, Harper determined that it was common for children to delay disclosing sexual abuse until after the incident, possibly years later. The State presented Harper's testimony to explain to the jury that J.J.'s behavior of not reporting his experienced sexual abuse until years after it occurred was not abnormal and did not suggest automatically that J.J. was fabricating the allegation. During Suttles's cross-examination of Harper, she elicited testimony that Harper's opinions regarding the prevalence of delayed disclosures among child victims of sexual abuse was not based on specific observations or percentages. Suttles challenges the reliability of Harper's testimony because Harper could not enumerate how many of the 863 interviews were of children under twelve years of age, or under ten years of age. Suttles further criticizes Harper's testimony because he could not state how many of the 863 children he interviewed initially denied any abuse or provided tentative disclosures, or how many of the 863 interviews dealt with sexual abuse as opposed to other types of abuse.

We are not persuaded that Harper's inability to reference specific numbers and/or percentages of the 863 interviews conducted by him to sub-categories of interviews selected by Suttles negates the overall reliability of Harper's testimony so as to preclude admission. To the

19

contrary, the record shows that Harper utilized his specialized training and experiences, in addition to the large sample size established in his years of working as a forensic interviewer, to develop a generalization of his cumulative interviews and determine what was "common" to those interviews. Suttles's demand for precise numbers and statistics did not undermine Harper's experiences or condemn Harper's statements as subjective beliefs or unsupported speculation. Harper's inability to provide more precise information regarding his experience with delayed disclosures certainly provided the jury with an opportunity to weigh Harper's testimony for a credibility determination. See Pickens, 332 S.W.3d at 321. But the criticism raised by Suttles in this point goes to the weight of Harper's testimony, not its admissibility.

We are guided further by the Supreme Court's emphasis in Kumho Tire Co. that the specific Daubert factors may or may not be the sole benchmarks of reliability for non-scientific expert testimony because the formation of an opinion depends upon the particular circumstances of the particular case at issue. Kumho Tire Co., 526 U.S. at 150–51. Given this direction, when combined with the depth of Harper's experience and personal observations, we are not persuaded that Harper's testimony lacked reliability.

While Missouri courts have not yet considered the reliability of delayed-disclosures evidence under the expert-testimony admission test set forth in Section 490.065.2, our holding is consistent with other jurisdictions. See, e.g., J.L.G., 190 A.3d at 464–65; People v. Bassett, 866 N.Y.S.2d 473, 477 (N.Y. 2008) (finding that CSAAS testimony is admissible under the Frye standard); State v. Shore, 814 S.E.2d 464, 473–74 (N.C. Ct. App. 2018) (finding that an expert's delayed-disclosures testimony was the product of reliable principles and methods); W.R.C. v. State, 69 So. 3d 933, 939 (Ala. Crim. App. 2010) (holding that delayed-disclosures testimony was admissible in child-sexual-abuse cases); People v. Perez, 105 Cal. Rptr. 3d 749, 760 (Cal.

20

Ct. App. 6th 2010) (determining that CSAAS testimony, although not admissible to prove the sex crime charged actually occurred, is admissible to rehabilitate the victim's credibility when the defendant suggests that the victim's conduct is inconsistent with his or her allegation). The trial court did not abuse its discretion in determining that Harper's delayed-disclosures testimony was reliable under the current standard in Missouri. See Zink, 181 S.W.3d at 72–73.

Ultimately, because Harper was a qualified expert, and his testimony regarding delayed disclosures was both reliable and relevant, the trial court did not abuse its discretion in admitting Harper's testimony at trial. See id. Point One is denied.

### B. Point Two—Det. Swinton's Testimony

Suttles similarly argues that Det. Swinton's testimony regarding delayed disclosures of child-victims of sexual abuse constituted particularized testimony that was improperly admitted to bolster J.J.'s credibility. Significantly, the record shows that throughout the trial, both the State and Suttles treated Det. Swinton as an expert witness. See State v. Edwards, 365 S.W.3d 240, 252 (Mo. App. W.D. 2012) (internal quotations omitted) ("To lay a proper foundation for the testimony of an expert witness, the proponent must show that the witness has sufficient expertise and acquaintance with the incident involved to testify as an expert. A witness is not considered an 'expert' witness unless and until a proper foundation has been laid as to his qualifications."). Specifically, the State asked Det. Swinton about her qualifications, experiences, and training as a police officer who investigates child-abuse cases. Additionally, both the State and Suttles elicited testimony from Det. Swinton regarding the frequency of delayed disclosures after incidents of child abuse in cases investigated by her. While the State and Suttles questioned Det. Swinton regarding her investigation of J.J.'s case, both parties amply probed Det. Swinton about her general experiences with delayed disclosures. Both parties

21

appeared prepared to examine Det. Swinton, and demonstrated no surprise by Det. Swinton's role as an expert witness in this case.

In its defense of the trial court's allowance of Det. Swinton's testimony, the State suggests for the first time on appeal that Det. Swinton was offered as a lay witness, testifying only about her personal knowledge of J.J.'s case. We note that had Det. Swinton testified merely as a lay witness, her detailed statements about delayed disclosures and the general process of disclosures by child-victims of sexual abuse would have been improper. We reject the State's suggestion that Det. Swinton was offered as a lay witness at trial because it is clearly contrary to the parties' treatment of Det. Swinton and contrary to the record as a whole. We acknowledge that the State did not endorse any witness as an "expert" on its witness list. However, at trial, the State expressly questioned Det. Swinton about her knowledge, skill, experience, and training concerning child-abuse investigations and delayed disclosures. Under Section 490.065, Det. Swinton's testimony qualified her as an expert. Section 490.065; Edwards, 365 S.W.3d at 252. Because the record is clear that Det. Swinton functioned and testified as an expert witness during trial, our analysis of her testimony regarding delayed disclosures mirrors our expert and relevance analyses regarding Harper's testimony.

Considering the reliability-prong of the Section 490.065 analysis, the record shows that Det. Swinton's testimony was "based on sufficient facts or data, reliable principles and methods and reliable application thereof." Jones, 569 S.W.3d at 54 (quoting Wright, 562 S.W.3d at 319). Specifically, Det. Swinton had worked four years in the child-abuse unit, investigating approximately 400 cases. Det. Swinton had completed various trainings involving investigating child-abuse cases. Additionally, the majority of Det. Swinton's cases involved child-victims of sexual abuse. Of those incidents, over ninety percent of the child disclosures were delayed. Det.

22

Swinton drew a conclusion from her experiences and trainings when she testified that delayed disclosures were common. We permit experts to "draw a conclusion from a set of observations based on extensive and specialized experience." Wright, 562 S.W.3d at 321 (quoting Kumho Tire Co., 526 U.S. at 156).

We note that Suttles similarly challenges the admissibility of Det. Swinton's testimony as unreliable, offering the same criticism she has of Harper's testimony—that Det. Swinton's statements were unreliable due to her inability to pinpoint specific numbers regarding the ages and case-types she encountered. We find this contention unpersuasive for the same reasons we rejected Suttles's challenge to Harper's testimony. Suttles's desire to have Det. Swinton recall select data components from her extensive investigative experiences did not undermine the reliability requirements for allowing Det. Swinton's testimony. However, as with Harper's delayed-disclosures testimony, Det. Swinton's inability to provide precise data components goes to the weight of her testimony, and provided Suttles the opportunity to challenge Det. Swinton's credibility to the jury. See Pickens, 332 S.W.3d at 321.

Given our holding of delayed-disclosures testimony as generally reliable, when combined with Det. Swinton's experiences and personal observations and the recognition of delayed-disclosures evidence in other jurisdictions, we are not persuaded that Det. Swinton's testimony lacked reliability. In conclusion, the trial court did not abuse its discretion in determining that Det. Swinton's delayed-disclosures testimony was admissible under Section 490.065. See Zink, 181 S.W.3d at 72–73. Therefore, we deny Point Two.

## II. Point Three—Hallucination Evidence

In her final point on appeal, Suttles focuses on the exclusion of evidence regarding the circumstances surrounding J.J.'s hallucinations. In particular, Suttles argues the trial court limited her defense by precluding her from presenting evidence that J.J. fabricated or

23

hallucinated the specific allegations made against her. In particular, Suttles challenges the exclusion of evidence surrounding J.J.'s 2017 disclosure of the abuse and evidence of J.J.'s hallucinations instructing him to commit burglaries.

As we noted in our standard of review, we afford the trial court broad discretion in evaluating the admissibility of evidence. See Zink, 181 S.W.3d at 72. Evidence must be both logically and legally relevant to be admissible. Anderson, 76 S.W.3d at 276. "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable." Id. Witness credibility is always logically relevant. State v. Contreras-Cornejo, 526 S.W.3d 146, 155 (Mo. App. W.D. 2017) (internal quotations omitted) ("A witness may be cross-examined about specific instances of his or her own conduct that speak to his or her character for truth and veracity, even if the issue is not material to the substantive issues in the case. Such testimony may, however, be limited by the court if it is more prejudicial than probative."). "Legal relevance weighs the probative value of the evidence against its costs—unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." Anderson, 76 S.W.3d at 276. Evidence of a crime victim's character is legally relevant only in limited circumstances. State v. Ramsdell, 570 S.W.3d 664, 668 (Mo. App. E.D. 2019) (internal quotations omitted). The crime victim's character may be relevant for impeaching the victim acting as a witness: "[t]he most common methods of impeaching a witness involve the admission of evidence regarding the following: the witness's incapacity or ability to perceive or remember; prior convictions; bias, interest, or prejudice; prior inconsistent statements of the witness; and the witness's reputation for truthfulness and veracity." Id. However, the trial court may limit the admission of character evidence if the prejudicial value of the evidence outweighs its probative value. Id.

24

Here, J.J.'s credibility was vigorously challenged throughout the trial. The record aptly shows that both the State and Suttles questioned J.J. in front of the jury regarding his allegations of abuse, the details surrounding the sexual-abuse incident, and J.J.'s mental health. Through this questioning, J.J. admitted that he experienced both auditory and visual hallucinations and was hospitalized for these hallucinations in 2017. J.J. also testified that both female and male voices would command him to act in certain ways. The trial court did not allow evidence that J.J.'s hallucination led him to break into people's garages or houses.

We are not persuaded that the offer of proof made by Suttles at trial was sufficient to show that continued questioning about J.J.'s hallucinations was sufficiently probative of J.J.'s credibility. See Anderson, 76 S.W.3d at 276. The offer of proof included J.J.'s admission that on occasion he had auditory hallucinations that directed him to harm others and enter into people's houses and/or garages; Suttles offer of proof provided no detail beyond J.J.'s acknowledgement of the occurrence of these hallucinations. The record suggests that evidence of J.J.'s hallucinations telling him to break into someone's house or garage was cumulative of the mental health evidence already presented to the jury. See St. Louis Univ. v. Geary, 321 S.W.3d 282, 292 (Mo. banc 2009) (internal citation omitted) ("Cumulative evidence is additional evidence that reiterates the same point."); State v. Green, 603 S.W.2d 50, 51 (Mo. App. E.D. 1980) (same). Further, although Suttles claims she was unable to properly present details about J.J.'s hallucinations surrounding the circumstances of his 2017 disclosure, Suttles did not specify what additional facts she sought to present through such evidence. Suttles's offer of proof did not provide any details that were relevant and not already admitted before the jury other than evidence of J.J.'s juvenile criminal history. The record does not suggest the trial court excluded any evidence that was not cumulative of the evidence already admitted at trial.

Suttles's offer of proof regarding J.J.'s hallucinations was not only cumulative, but also was unfairly prejudicial because the probative value of such evidence was outweighed by its prejudicial effect. See Green, 603 S.W.2d at 52 ("Even if evidence is cumulative, that alone is not sufficient to exclude its admission."). Such evidence would play to the basic fears and concerns of jurors for community safety without furthering their ability to assess the credibility of J.J.'s allegations against Suttles. Evidence of J.J.'s hallucinations, hospitalization, and effects of the hallucinations had already been admitted and witnesses were questioned extensively by both the State and Suttles. Admitting further evidence of hallucinations contributing to J.J.'s commission of a crime presented a significant danger that the jury could become unfairly prejudiced against J.J. See Ramsdell, 570 S.W.3d at 669 (internal quotations omitted) ("[T]he credibility of a witness in a criminal case cannot be impeached by showing that his or her reputation for morality is bad, but such an attack must be addressed directly to his or her reputation for truth and veracity."); State v. Clark, 747 S.W.2d 197, 200 (Mo. App. E.D. 1988) ("Only in very limited circumstances is evidence of the character of a crime victim relevant and admissible."). The record before us does not suggest that the trial court abused its discretion in sustaining the State's objection to Suttles's questions regarding J.J.'s hallucination. Point Three is denied.

### Conclusion

The judgment of the trial court is affirmed.

_____
KURT S. ODENWALD, Presiding Judge

Gary M. Gaertner, Jr., J., concurs.
Colleen Dolan, J., concurs.

26